AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 OCT 24 PM 4:02

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| A residence located at: 1555 North Fairfield Road Beavercreek, Ohio 45432 | ) |
| | ) |

Case No. 3:18 mj 707

MICHAEL J. NEWMAN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339B | Attempt to Provide Material Support to Foreign Terrorist Organization |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Herwig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____10/24/2018_____

_____
*Judge's signature*

City and state: Dayton, Ohio

Hon. Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael Herwig, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant under Rule 41 of the Federal Rules of Criminal Procedure to search the premises located at 1555 North Fairfield Road, Beavercreek, Ohio 45432, hereinafter the "SUBJECT PREMISES," as further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been an agent since March 16, 2008. I have been assigned to the Joint Terrorism Task Force since 2008 and have worked cases involving international and domestic terrorism. As part of these investigations, I have participated in physical surveillance and records analysis, worked with informants, conducted interviews, served court orders and subpoenas, and executed search warrants.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign terrorist organization) have been committed by **Naser Almadaoji ("Almadaoji")** and that there is probable cause to believe that evidence, fruits, and instrumentalities of these violations are present at the SUBJECT PREMISES.

**PROBABLE CAUSE**

5.     On or about October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

6.     On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

7.     On December 31, 2015, the United States Secretary of State designated ISIL Khorasan as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. The Secretary of State also listed the following aliases for ISIL Khorasan: Islamic State's Khorasan Province, ISIS Wilayat Khorasan, ISIL's South Asian Branch, and South Asian Chapter of ISIL (collectively "ISIS Wilayat Khorasan"). To date, ISIL Khorasan remains a designated FTO.[1]

---

[1] According to the Department of State, ISIS Wilayat Khorasan announced its formation on January 10, 2015. The group is based in the Afghanistan/Pakistan region and is composed primarily of former members of Tehrik-e Taliban Pakistan and the Afghan Taliban. The senior leadership of ISIS Wilayat Khorasan has pledged allegiance to Abu Bakr al-Baghdadi, the leader of ISIS. This pledge was accepted in late January 2015 and since then ISIS Wilayat Khorasan has carried out suicide bombings, small arms attacks and kidnappings in eastern Afghanistan against civilians and Afghan National Security

8.      On March 28, 2014, the United States Secretary of State designated Ansar Bayt al-Maqdis ("ABM") as an FTO.  According to the Department of State, in November 2014, ABM officially declared allegiance to Abu Bakr al-Baghdadi, who is the self-proclaimed leader of ISIS.  On September 22, 2015, the Department of State amended ABM's designation to add ISIL Sinai Province as the primary name of the Islamic State affiliate located in Egypt's Sinai Peninsula, and the designation includes "Wilayat Sinai" as a known alias for ABM (collectively "Wilayat Sinai").[2]

9.      **Almadaoji** is a 19-year-old individual who was born in Iraq and is a naturalized U.S. citizen.  **Almadaoji** resides at the SUBJECT PREMISES in Beavercreek, Ohio, within the Southern District of Ohio.

**I.   Almadaoji travelled to Egypt and Jordan in February 2018.**

10.     Between approximately February 16, 2018, and February 24, 2018, **Almadaoji** traveled to Egypt and Jordan.

11.     On or about February 24, 2018, United States Customs and Border Protection ("CBP") interviewed **Almadaoji** upon his re-entry into the United States. During the interview with CBP, **Almadaoji** claimed to have traveled by himself to Jordan and Egypt and returned after a taxi driver stole his backpack and $3000.  **Almadaoji** claimed that he reported the incident to the U.S. Embassy located in Jordan.

12.     When talking with CBP, **Almadaoji** referenced U.S. airstrikes that killed Muslims and stated the United States needed to leave the Middle East. **Almadaoji** further stated

---

and Defense Forces, and claimed responsibility for May 2015 attacks on civilians in Karachi, Pakistan.

[2] Wilayat Sinai rose to prominence in 2011 following the uprisings in Egypt. It is responsible for attacks against the Israeli and Egyptian governments and against tourists in Egypt. In November 2014, Wilayat Sinai officially declared allegiance to ISIS.

he thought about joining the Peshmergan military in northern Iraq because it was the "real force[ ] in Iraq to stop ISIS, not U.S." **Almadaoji** stated ISIS was "bad for killing other Muslims," but most Muslims killed by ISIS were "Shiites," and "Shiites were their [Sunnis] natural adversaries." **Almadaoji** explained Shiites "didn't follow true Islam" and the people of Iraq were no freer now than before ISIS invaded Iraq.

13.     During the interview, CBP observed four shemagh-style head wraps in **Almadaoji's** bag. When CBP asked about the shemaghs, **Almadaoji** responded he liked the way they looked on "fighters." **Almadaoji** was asked if he had seen any fighters while overseas, and **Almadaoji** answered, "no not really," but stated he observed "fighters" wearing shemaghs online.[3]

## II. Almadaoji communicated online with individuals he believed to be working for ISIS.[4]

14.     On or about August 15, 2018, **Almadaoji** used an online messaging application to communicate with an FBI Confidential Human Source who was posing as an ISIS supporter ("CHS Persona #1").[5] **Almadaoji** told CHS Persona #1 that he was fluent in Arabic and English, and **Almadaoji** offered to help CHS Persona #1, stating "I don't have much computer skills but

---

[3] While **Almadaoji** did not admit to CBP that he intended to join Wilayat Sinai, he later represented to an FBI confidential human source that he tried to join the terrorist organization during his travels to Egypt and Jordan. And **Almadaoji** offered to provide advice and guidance online about how to travel overseas and avoid detection and suspicion from law-enforcement officers. *See* below at paragraphs 28-29.

[4] During the course of the investigation, **Almadaoji** communicated with one online covert employee, one undercover employee, and multiple confidential human source personas. This affidavit does not address each of the employees/personas, nor does it reference each communication relating to **Almadaoji**.

[5] CHS Persona #1 posted a video depicting ISIS combat operations in Syria, and **Almadaoji** stated "Alhamdulallah," which I understand to mean "Praise be to the Lord."

if you guys ever need something in English or Arabic, let me know. I speak both languages fluently."

15. On August 16, 2018, **Almadaoji** told CHS Persona #1 that he was not interested in college because he was "not planning to stay in this land much longer." CHS Persona #1 asked **Almadaoji** if he was intending hijra,[6] and **Almadaoji** responded, "Yes akhi but I make dua and take every heed there is and Allah Subhanahu wa Ta'ala will find a way for His sincere servants."[7] CHS Persona #1 offered to put **Almadaoji** in contact with a British individual in Iraq who "has helped an old friend of me get to khurassan."[8] In response, **Almadaoji** stated, "anything you have is great."

16. On August 16, 2018, **Almadaoji** initiated conversation with the individual he understood to be the Iraq-based British contact referenced above ("CHS Persona #2"). During the conversation, **Almadaoji** told CHS Persona #2 that he recently met CHS Persona #1 on the messaging application and discussed hijra with CHS Persona #1. **Almadaoji** told CHS Persona #2 that he was not ready for hijra, but he was trying to assist a brother in Egypt. To that end, **Almadaoji** stated, "I know wilayat Sinai is not possible at the moment" and inquired "is there a way to Libya or anywhere near egypt."

17. When CHS Persona #2 inquired why **Almadaoji** was not ready for hijra, **Almadaoji** stated, "Right now my problem is money." **Almadaoji** stated: "I want sham but

---

[6] Based on my training and experience, and information from other agents, I know that "Hijra" or "Hijrah" is a term used to refer to traveling to territory controlled by the Islamic State.

[7] Based on my training and experience, "akhi" in this context means "brother" and "Allah Subhanahu wa Ta'ala" means "the most glorified, the most high."

[8] Based on my training and experience, and information from other agents, I know that "khurassan," also spelled "Khorasan," or "Khurasan," refers to ISIS affiliates in Afghanistan.

that's not possible currently but maybe a few months from now when I'm ready."[9]  When CHS

Persona #2 asked **Almadaoji** who he supported, **Almadaoji** refused to identify the group by

name, stating: "Lol who goes by wilayat" and "I just don't like to formally say it just in case the

authorities here get their hands on these conversations."  When CHS Persona #2 said he has

"spoken to brothers who think I'm AQ" (referring to Al-Qaeda), **Almadaoji** responded, "Lol no

not those guys."

18.     CHS Persona #2 asked **Almadaoji** why he wanted to make hijra and suggested

that "[m]any brothers will say that you are in the best place for jihad."  **Almadaoji** responded by

saying "I don't like where this is going . . . we'll stick to hijrah for now."  CHS Persona #2

stated, "I am not trying to push you towards anything I have no way of helping you with

something in your own country."  **Almadaoji** stated: "I know this akhi but once there us hijra

then there will jihad in the land of hijra.  I don't like to keep traces back to me that's why I'm not

saying somethings by name just incase I end up messaging the wrong person without knowing."

19.     Between approximately August 18, 2018, and August 20, 2018, **Almadaoji**

continued communicating with CHS Persona #2.  On August 19, 2018, CHS Persona #2 offered

to connect **Almadaoji** with "American brothers who have gone back" and who "often help

brothers out."  **Almadaoji** responded, "That'll be great akhi ask around and let me know" and

"Tell them north east us."  When **Almadaoji** inquired "why did they go back exactly," CHS

Persona #2 stated "Can't say . . . your only allowed to leave if the emir has something for you to

do.  Let's say that they have projects wherever they are."  **Almadaoji** responded, "Oh I see.  I

didn't mean to ask it that way."

---

[9] Based on my training and experience, and information from other agents, I know that "Sham" refers to the Levant, a geographic area including portions of Syria, Lebanon, Palestine, and Jordan.  I also know that "Sham" commonly is used when referring to the portions of Syria where ISIS operates.

20.     On or about August 20, 2018, **Almadaoji** told CHS Persona #2 that he had "been to egypt once and met" an Egyptian associate there.  **Almadaoji** stated: "I don't wanna say here why I was in egypt but him and I planned something and it didn't work at well."  CHS Persona #2 inquired, "Ahh how you know wilaya Sinai is hard to reach?"  **Almadaoji** replied "Yea unfortunately I had to learn the hard way despite the fact I was talking to a brother and he told me that himself."   When asked by CHS Persona #2 if the brother had tricked him, **Almadaoji** stated, "No akhi the brother warned me it was difficult to reach Sinai, I don't know if he was in the lands of Dawlah or just a munasir but no I didn't end up in prison either."[10]

21.     CHS Persona #2 asked for **Almadaoji's** thoughts on "assisting with some projects in your own country."  After CHS Persona #2 clarified that he was talking about the United States, **Almadaoji** stated it was a "big ask" and asked CHS Persona #2 to "shed a little light on the type of projects."  CHS Persona #2 replied: "I ask only if you would be willing or interested to contribute if hijra is not possible."  **Almadaoji** replied: "Of course I'm always willing."

### III.  Almadaoji pledged allegiance to ISIS and Abu Bakr Al-Baghdadi, and he discussed his desire to cause a conflict in the United States.

22.     On or about August 22, 2018, **Almadaoji** continued communicating with CHS Persona #2, who said to **Almadaoji**, "I told some of the brothers here about you, they were very impressed and want you to send a bayyah, two of our local leaders agreed to send you a video to."[11]  **Almadaoji** stated: "In shaa Allah we will then proceed forward with it" and "But since our talk about projects in the west I did a lot of thinking and I imagined a scenario of the collapse of the US as a nation. . . . They have alot of weak spots 2 really weak spots that would ignite the

---

[10] Dawla and Dawlah are terms associated with, and commonly used to refer to, ISIS.

[11] Based on my training and experience, and information from other agents, I know that bayyah, bayyat, and bayat, are Arabic terms that mean pledge, or oath, of allegiance to a leader.

deadliest civil war on earth if the right spots are poked." **Almadaoji** explained a proposal to start
a conflict between the United States Government and anti-government militias.

23.     When describing his proposed plot to start a conflict, **Almadaoji** explained how
"federal buildings" were "more sensitive for the militias to hit than police stations and military
bases." **Almadaoji** stated, "With a coordinated attack such as car bombings parked next to fed
buildings with all the previous build we talked about. . . . And there you have the US on its
knees." **Almadaoji** continued, "It may take the person a long time to pull something off but it's
long term . . . . This will divide the nation as a whole, including government, military and law
enforcement."

24.     On or about August 24, 2018, **Almadaoji** told CHS Persona #2: "After thinking
about it for sometime, these projects need secrecy, and lots of it. So there can't be any physical
evidence that leads it back to the I.S. [the Islamic State; ISIS]."

25.     On August 25, 2018, **Almadaoji** told CHS Persona #2: "Although I did not get
the project done. In shaa Allah expect a video coming soon today." **Almadaoji** asked CHS
Persona #2 whether he should send the video via messaging application, stating "Let me know as
soon as possible akhi, I'm about to go shoot the video soon." **Almadaoji** explained he would
send the video on the following day.

26.     On or about August 26, 2018, **Almadaoji** told CHS Persona #2: "Earlier when I
tried to go do the video, I felt a sudden need for sleep, I had to force myself up to pray dhur and then
went to sleep immediately after. There will be a spiritual struggle to get through with this akhi, I hope
you understand if I take a little bit too long to get the video." CHS Persona #2 replied: "Ok brother
send when you can, today or tomorrow will be fine. Fighting here is starting to pick up so I want to
make sure we get you in contact with the brothers soon that is my only concern. May Allah guide and

facilitate you akhy." Later that day, **Almadaoji** forwarded the bayyah video referenced on August 22, 2018, to CHS Persona #2. In the video, **Almadaoji** is wearing a head scarf and states:

> Praise be to God and peace and prayers be upon His messenger. I pledge allegiance to Sheikh Abu Bakr al-Baghdadi, the Caliph of the faithful, to obey his command in all situations, in difficulty and in prosperity, and not to dispute orders until I see a common disbelief of which I have a proof from God. God is the witness to what I am saying.

27.    On or about August 27, 2018, CHS Persona #2 provided **Almadaoji** with a list of questions purportedly from a hijrah application. One of the questions asked: "what is your skillset that could contribute to our cause/operations (training, experience, expertise, etc)?" **Almadaoji** responded, "Not alot if skills besides translating from arabic to English and vice versa. As well as intelligence." Another question asked: "What role are you willing to play in the USA?" **Almadaoji** responded, "I believe that's a role that's already discussed in the plan as well as my time talking to you. In shaa Allah you can explain that to them."

## IV. Almadaoji provided guidance and advice on how other individuals could avoid detection by, and suspicion from, law-enforcement officers when traveling for the purpose of joining ISIS.

28.    On or about August 31, 2018, CHS Persona #2 informed **Almadaoji** that it would be helpful if he could provide advice based on **Almadaoji's** previous hijrah to Egypt and Jordan. **Almadaoji** offered to provide guidance so that other people could avoid his mistakes—"as well as to avoid them in shaa Allah"—and stated "In shaa Allah I'll make a list of do's and don'ts." Among other advice, **Almadaoji's** list included the following guidance:

- Ok first thing is you need to dress like a western guy who's about to enter a bar to pick up a few ladies. Something like jogging pants and van shoes as well as a long sleeve sweatshirt is great

- Unless you have a valid citizenship for the country you're about to travel to, then buy a 2 way ticket and make sure you print your return ticket as well incase they ask for it in the airport

- Of course delete anything suspicious in your phone but don't restart it as not to cause a suspicious alarm incase they ask to search your devices

- Don't bring anything suspicious either, such as a military bag, jacket, t-shirts, pants, etc

- And show them the case but I don't think that's something to worry about, if they ask who financed the trip, tell them you did

- When I was heading to al arish in northern sinai and our taxi was stopped by the military who blocked off the bridge cause it was close, no one in or out. There is a nice resort in al erish called swiss en al arish. That was my cover story. I told them it was next to the ocean and I'm here for vacation

- When going back, you may get a small paper to fill out about why your visiting the country, your name, the place your staying out, vice versa for citizens returning. Don't freak out. Remember Allah, put your trust in Him Subhanahu wa Ta'ala stick to your cover. Be nice to the officer questioning you, have a smile, keep a direct eye contact, and of course be cooperative

29.     CHS Persona #2 asked how **Almadaoji** determined if the border was good to cross and whether there were differences in Egypt and Jordan.  **Almadaoji** responded:

- I didn't determine that, I put my trust in Allah SWT and headed there. In regards to differences. Egypt was tightly controlled. When I was in jordan, I couldn't find a way in, so I started a small conversation with a taxi driver after we drove around for a bit and i bought him a nice sandwich to build up trust. I told him i had family in dar'a[12] and there was a way in. Subhan Allah he put me in touch with a guy who snuggles people into Europe

    I spoke to him and we met, he said there wasn't a way into syria from jordan but he could fly me out to turkey and from there meet the turkish mafia and that they would smuggle me anywhere in syria that I want

**V.  Almadaoji translated ISIS propaganda.**

30.     On or about September 14, 2018, CHS Persona #2 asked **Almadaoji** if he previously offered to translate information from Arabic to English and, if so, whether **Almadaoji**

---

[12] Based on my training and experience, and the nature, context, and timing of the communication, when **Almadaoji** refers to "dar'a," I believe he is referring to a city in Syria close to the border with Jordan.

still was willing to do so. **Almadaoji** responded, "Yea, but I can't do hard Arabic vocabulary."

**Almadaoji** then asked, "They want it for small books, or magazines and amaq[13] related?" CHS

Persona #2 replied that he was unsure, but he was talking to a brother in France who needed

things translated to English.

      31.     On or about September 14, 2018, the CHS used another French-based persona

("CHS Persona #3") and contacted **Almadaoji**. CHS Persona #3 informed **Almadaoji** that he

was given **Almadaoji's** contact information because **Almadaoji** offered to translate materials.

**Almadaoji** replied, "Yes akhi" and "How an I help." CHS Persona #3 informed **Almadaoji** that

his/her Arabic was not very good and asked, "These are important dawla document you are ok to

translate them?" **Almadaoji** replied, "In shaa Allah it shouldn't be a problem." CHS Persona #3

provided a document written in Arabic and said, "Try this one first it is important for our

brothers in cyber caliphate."[14] **Almadaoji** responded, "In shaa Allah I'll get on later tonight."

CHS Persona #3 thanked **Almadaoji**, who replied, "Don't thank me akhi, it's my duty."

      32.     On or about September 16, 2018, **Almadaoji** provided CHS Persona #3 with a

digital file entitled "In The Name of Allah.docx." The file contained a document that accurately

translated the ISIS propaganda.[15]

---

[13] Based on my training and experience, and information from other agents, I know that Amaq is the official propaganda-based news agency controlled by ISIS.

[14] This is a document that ISIS previously disseminated online.

[15] CHS Persona #3 provided **Almadaoji** with another document for translation from Arabic to English. **Almadaoji** accepted the materials for translation, but he did not complete the translation before attempting to travel overseas for the purpose of joining ISIS Wilayat Khorasan.

**VI. Almadaoji decided to travel overseas and join ISIS Wilayat Khorasan, where he would receive military training.**

    **A. Before traveling overseas to join ISIS Wilayat Khorasan, Almadaoji discussed his plan to start a conflict in the United States.**

33.    On or about September 6, 2018, CHS Persona #2 informed **Almadaoji** that a U.S.-based individual would be contacting **Almadaoji**. Then, an FBI Undercover Employee ("UCE") contacted **Almadaoji**. **Almadaoji** told the UCE about his plan to cause a conflict in the United States:

**Almadaoji:** *Let's start of a plan with the 2 of us*

**UCE:** *K*

**Almadaoji:** *Number of assassination. Snipers, sticky ied's, suicide look a like*

**Almadaoji:** *Before we do that. We pull something off like filling militia leaders computers and phones with child sexual abuse then tip the fbi. When the militias see their leaders are being arrested left and right, they'll panic.*

**UCE:** *No doubt* [text in Arabic]

**Almadaoji:** *Then we start off assassinations.*

**Almadaoji:** *Soon militias will have standoffs with the feds which will turn bloody*

**UCE:** *Assassinate who?*

**Almadaoji:** *Militia leaders*

**UCE:** *Gotcha*

**Almadaoji:** *We'll also fire at feds so it looks like a 2 way thing and the militias are taking revenge*

**UCE:** *Now I see how this is coming together*

**Almadaoji:** *After it turns bloody, imagine a car bomb going off at a federal building killing dozens of feds*

34.    **Almadaoji** then proposed robbing the "box of money" from the "large shia temple in Dearborn," or "wait for the truck drive to come to an atm with a bag of cash, ambush him and take it," as potential ways they could fund the operation.

35.    On or about September 8, 2018, the UCE asked **Almadaoji**, "Is Dawla gonna take credit for this? Like on Amaq?" **Almadaoji** responded, "No we agreed to credit whatsoever. Even after things hit the fan and all out war breaks here in shaa Allah, we won't risk taking credits to starting the war as not to ally them against us once again . . . No credit whatsoever*."

36.    On or about September 8, 2018, **Almadaoji** told CHS Persona #2 that he talked to the "brother" in the United States. **Almadaoji** informed CHS Persona #2 that they needed money to carry out the plan. **Almadaoji** stated, "we need a guide on how to make a vbied. If you brothers could make it, send it to us through email. I'm gonna need to download it."[16] **Almadaoji** also requested "a computer expert who's an expert in hacking. That's also vital." **Almadaoji** said, "Tell the brothers to rest assure it's all coming together bi'ithn Allah."

37.    On or about September 11, 2018, the UCE asked **Almadaoji** what sheiks he followed; **Almadaoji** replied, "Imam anwar al awlaki."[17] On or about September 12, 2018, **Almadaoji** talked with the UCE about robbing an ATM, or ambushing an armored truck: "That truck guy must have multiple bags of cash to fill multiple atms. We'll ambush him, make open the back door get in the atm back room. Grab all the cash in there and all the bags in the truck."

_____

[16] Based on my training and experience, and information from other agents, I know that "vbied" refers to "vehicle-borne improvised-explosive devices."

[17] Anwar al-Awlaki was an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula ("AQAP"), a Yemen-based designated foreign terrorist organization that claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea, and Yemen since its inception in January 2009. Pursuant to a Presidential Executive Order, Al-Awlaki was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010. Al-Awlaki was killed in Yemen in September 2011.

> **B. Almadaoji decided to travel to Kazakhstan, where he could be smuggled to ISIS Wilayat Khorasan—one of the terrorist organizations he sought to join.**

38.     On or about September 13, 2018, **Almadaoji** told the UCE that the UCE could make hijrah because "the brothers can put you in contact with smugglers." **Almadaoji** clarified, "I'm talking about the ones in Iraq, they can get you in contact, the brothers from Khurasan keep insisting on making hijra there in the last few videos they released."

39.     **Almadaoji** and the UCE then talked about training with ISIS:

**UCE:** *Do u think we can flee n make hijra after we do our work here?*

**UCE:** *We'll have $$$ for plane tickets right?*

**Almadaoji:** *I'm not sure how it's gonna play out, but we need training on weapons and on how to handle ourselves in different types of situations*

**Almadaoji:** *I'm think we get the proper training first than come back*

* * *

**Almadaoji:** *We get smuggled in and then smuggled out of Khurasan no problem*

**UCE:** *Really? No Problem?*

**Almadaoji:** *No one will suspect a thing unless we leave a trace*

**Almadaoji:** *It's same as working here, we will have a problem if we leave a trace so we don't plan to. We shouldn't plan to leave a trace in Khurasan either*

**Almadaoji:** *Come on akhi it's not rocket science*

**UCE:** *Do u have any idea of what it's like in Khurasan?*

**Almadaoji:** *No but why does that matter*

**UCE:** *Just trying to think it thru*

**UCE:** *Like r there even buses and trains to get around*

**UCE:** *Or what's the closet airport*

**Almadaoji:** *We pay smugglers. We can go through Kazakhstan*

14

**UCE:** *How do we find a trustworthy smuggler*

**Almadaoji:** *The brothers have that covered*

**UCE:** *What brothers? We're not talking to the same brothers*

**Almadaoji:** *No but the one I'm talking to has contacts with smugglers in Kazakhstan*

**UCE:** *Ok*

**Almadaoji:** *I'll propose the idea*

40.     On or about September 14, 2018, **Almadaoji** confirmed his plan with CHS Persona #2: "Forgive me for asking you too much, but as you know we lack training so we're thinking of heading to Khurasan for that once we have enough funds. Once that's taken care of, we'll return to the US."

41.     On or about September 17, 2018, **Almadaoji** suggested robbing a jewelry store to obtain the necessary funding for overseas travel and asked the UCE to find buyers. On or about September 18, 2018, the UCE and **Almadaoji** met at a local parking lot, and the UCE drove **Almadaoji** to a park in Beavercreek, Ohio. Just prior to his arrival at the local parking lot, **Almadaoji** was observed by surveillance walking on the road between the SUBJECT PREMISES and the meeting location. At that meeting, **Almadaoji** and the UCE discussed funding. **Almadaoji** stated, "You know, we gotta find a way to do it ourselves. And I think that the option I presented to you yesterday [the jewelry heist], I think that's the best option we have" and "[t]hen we go, we go to Kazakhstan."[18]

42.     **Almadaoji** explained that Astana was the capital of Kazakhstan, and it has a tourism-based economy. The UCE asked **Almadaoji** if he researched it; **Almadaoji** replied, "Oh

_____

[18] Many of the summaries of, and quotes from, the conversations between **Almadaoji** and the UCE/CHSs refer to preliminary transcriptions provided by the FBI.

yeah, I research it. The only problems we are going to face. The visa only lasts for a month. We're going to be out of the country for more than that. So, unless, you know, we find a way around it or say." The UCE then summarized the plan set by **Almadaoji**:

> **UCE:** *Alright we fly from the US to Kazakhstan.*
>
> **Almadaoji:** *Right.*
>
> **UCE:** *Get the one month visa. And then from there.*
>
> **Almadaoji:** *To Khorasan.*
>
> **UCE:** *Khorasan. Wilayat al-Khorasan.*
>
> **Almadaoji:** *Right.*

43. **Almadaoji** and the UCE discussed being smuggled into Afghanistan. **Almadaoji** explained they would have to cross two countries, move through mountainous terrain, and travel on foot, stating, "Inshallah we have to go through the hardship, you know what I'm saying" and "Keep your eyes on the horizon, Khorasan."

44. While **Almadaoji** planned with the UCE, **Almadaoji** separately continued communicating with CHS Persona #2. On or about September 26, 2018, **Almadaoji** told CHS Persona #2: "By the way I'm the one leading everything here between me and the brother. I once again remind you, I know more about what's going with this whole thing than he does." **Almadaoji** further stated, "Too many things and plans are being thrown around right now, I need to manage this and figure out what best works out for us."

45. On or about September 26, 2018, **Almadaoji** again discussed starting a conflict in the United States. To that end, **Almadaoji** asked CHS Persona #2 for support: "I would also like to have 2 more guys to run point on executing these operations, and give us the ability to operate on more than one front. Now I know you don't know any, but if you could speak to the ameers

on your end and see if they could talk to other ameers and pull a few strings, that would be great. 5 operators all together. 1 computer expert providing information for the operation and communication during the operation, and 4 of us running point in carrying out the special operations. I will personally deal with the funds myself and come up with plans to fund us, so you don't have to worry about that."

46.      CHS Persona #2 explained to **Almadaoji** that ISIS could not provide additional resources. **Almadaoji** then decided to focus his efforts on traveling overseas and training with ISIS Wilayat Khorasan.

47.      On or about September 27, 2018, **Almadaoji** told CHS Persona #2, "Seems like khurasan is easiest way if you have contacts in kazakhstan as we spoke about before . . . . If the plan doesn't interest them, we can look at different ones that I already have in place and with enough resources, we can launch multiple ones with different teams that won't know each other or know the other plans are in place." **Almadaoji** outlined two plans that could contribute to the "economic collapse" of the United States, which included the kidnapping of wealthy individuals and the targeting of the power grid in the United States. CHS Persona #2 suggested those plans would require tremendous resources and instead offered to help **Almadaoji** if he wished to travel to Sham or Khorasan. **Almadaoji** responded, "I still think khurasan is the place for a temporarily stay but sham for a permanent stay. This all depends if resources can be provided or not. My ideas are to boost things up but eventually the US will collapse no matter what."

48.      On or about September 28, 2018, CHS Persona #2 asked what kind of training **Almadaoji** would like to receive when in Khorasan. **Almadaoji** responded, "All type of training from weapons experts training, planning, executing, hit and run, capturing high value targets, ways to break into homes and avoid security guards. That type of training. Shouldn't take more

than 3 months." **Almadaoji** and CHS Persona #2 then discussed travel options, including Iraq and Sham, but **Almadaoji** stated, "In shaa Allah. We'll stick to khurasan for now." **Almadaoji** advised, "Once the money is in our hands, we should be there within a week in shaa Allah."

49.     On or about September 28, 2018, when communicating with CHS Persona #2, **Almadaoji** also communicated with the UCE, who asked **Almadaoji** if he was telling his family about their trip.  **Almadaoji** responded, "No never."  The UCE then said, "We just leave and nobody knows." **Almadaoji** replied "In shaa Allah" and said "Just a vacation to kazakhstan."

50.     On or about September 29, 2018, the UCE told **Almadaoji** they could obtain funds through a credit-card scheme. **Almadaoji** told the UCE they would need $1700 each for flights, plus $800 for smuggling, and $200 for food, taxis, and lodging.  The UCE asked **Almadaoji** about the smugglers. **Almadaoji** replied, "The brother will put me in contact with them and I assume that's once we get there," and he confirmed, "So yea I'll be the one dealing with the issue of smugglers in shaa Allah."

51.     On or about September 30, 2018, the UCE asked **Almadaoji** if he thought they could request training to make IEDs when in Khorasan. **Almadaoji** replied, "As I said akhi we're going to kazakhstan as tourists."

52.     On or about October 1, 2018, the UCE told **Almadaoji** that he received the first two credit cards in the mail and would try to withdraw cash. **Almadaoji** advised the UCE to "park your car far and walk the rest" and "Gloves too no need for a hoodie as long as you have the hat. Don't wanna look too suspicious" and "Keep your head down and put the glasses on when you get close to the atm."  Later that evening, the UCE told **Almadaoji** that he obtained $500 for each of them, to which **Almadaoji** replied, "Alhamdulillah."

53.     On or about October 1, 2018, **Almadaoji** asked CHS Persona #2, "Where do we land exactly in kazakhstan? I'm thinking Astana but it's far from the southern part of the country and I don't want to take trains. Also what about the other country/ies, do we need visa or are getting smuggled through them too?"

54.     On or about October 2, 2018, the UCE told **Almadaoji** that he had withdrawn another $500 per credit card. **Almadaoji** also told the UCE, "Just finish the 1,000 for each card tonight in shaa Allah and bring me the whole 2,000 on Thursday if you can in shaa Allah." **Almadaoji** mentioned that they may go to a city other than Astana, possibly Almaty.[19]  When the UCE asked if there were smugglers in Almaty, **Almadaoji** admonished the UCE by saying, "What smugglers? We're there for vacation."

55.     On or about October 3, 2018, **Almadaoji** inquired whether the UCE had obtained more cash.  The UCE confirmed that he obtained an additional $500 per card.  **Almadaoji** instructed the UCE to rent a car and "tell them your dropping it off at the Columbus airport." The UCE said there may be security cameras and they should not be seen together on the day of the departure.  **Almadaoji** responded, "It won't matter in shaa Allah we'll be leaving and not coming back."  The UCE advised that there would be enough cash for **Almadaoji** to use a bus, or taxi, to travel to the airport in Columbus. **Almadaoji** responded, "Look akhi, I need to buy a few things before going to the airport. This what we'll do. You rent a car pretty early. Pick me up. We'll go buy my things. Then once we're near the airport. You call me a [ride-share car] and we'll meet on the plane in shaa Allah."

56.     On or about October 4, 2018, the UCE told **Almadaoji** that he had $2000 and did not know when he would be able to meet **Almadaoji** in person other than that day, or the day of

---

[19] Almaty is Kazakhstan's most populated city.

travel. **Almadaoji** said it was better to wait until they each had $4000 before booking the tickets. The UCE asked if they were still leaving on October 16, 2018, and **Almadaoji** responded, "Around that date yea." **Almadaoji** later told the UCE not to worry about driving together to the airport: "Plus bro your thinking too much about it. It doesn't matter if you drop me off at the airport . . . If anybody has anything about us we'll be stopped or in the airport so we put our trust in Allah Subhanahu wa Ta'ala."

57. Later that day, the UCE picked up **Almadaoji** and drove to a nearby park. During the meeting, the UCE provided **Almadaoji** with a cup containing $2000 cash. Just prior to meeting with the UCE, **Almadaoji** was observed by surveillance leaving the SUBJECT PREMISES and walking to the meeting location. The UCE and **Almadaoji** discussed what airports they might depart, the price of plane tickets, and purchasing plane tickets with cash versus a debit card. **Almadaoji** talked about Astana, Kazakhstan, and the cost for a train to southern Kazakhstan. The UCE asked if the smugglers were with ISIS Wilayat Khorasan because he did not want to get ripped off by criminals and wanted to ensure they were trusted by ISIS Wilayat Khorasan. **Almadaoji** replied he was asking a brother for details relating to the smugglers.

58. Later, the UCE asked about the arrival in Khorasan and whether they would go straight to training. **Almadaoji** stated he understood when they arrived, they would be asked about the kind of special skills each of them possessed. **Almadaoji** mentioned having the skill to translate Arabic to English and English to Arabic.

59. **Almadaoji** told the UCE that they would travel looking "like straight up Americans." Once on the flight from Germany to Kazakhstan, they would be "buddies" traveling

together.  **Almadaoji** confirmed that the al-mahajiroun[20] would be happy when **Almadaoji** and the UCE arrived and advised it would be fine to pack a shemagh.  When leaving the park, **Almadaoji** confirmed he had the cup containing the cash.  **Almadaoji** indicated he was going to take $300 with him, deposit the remaining cash, and use a debit card to purchase his plane ticket. After the meeting with the UCE, **Almadaoji** was observed by surveillance walking to and entering the SUBJECT PREMISES.

60.     On or about October 4, 2018, **Almadaoji** informed CHS Persona #2 that they had $4000 and were waiting for an additional $4000.  **Almadaoji** stated, "I need to know what city to land in."  CHS Persona #2 provided Peshawar and Astana as options, and CHS Persona #2 requested that **Almadaoji** choose the destination city, send the travel itinerary, and once **Almadaoji** landed, provide a photo so that CHS Persona #2 could arrange for the driver to pick up **Almadaoji** at the airport.  **Almadaoji** responded, "Astana" and "I'm not gonna send you anything besides that for security purposes.  I already have my tazkiya.[21]  If anyone has a problem with that, they can deal with it.  Gave bay'a and got tazkiya for that, if they are afraid of me being a spy, I'm afraid your fbi and need my itinerary for prison purpose.  I'm not gonna argue about that so deal with from your side.  If you disagree, I'll let the brother know and he'll make his own choice."  CHS Persona #2 explained the request was for **Almadaoji's** safety and that he needed to know when **Almadaoji** arrived in Astana to arrange for the smuggler. **Almadaoji** replied he would take a picture when in Astana, stating "I can take care of myself so

---

[20] Based on my training and experience, and information from other agents, I understand the term "al-mahajiroun" translates to "emigrant(s)," and it is used when referencing individuals who make hijrah. I further understand the term is used synonymously for foreign fighters who completed hijrah to join the Islamic State.

[21] Based on my training and experience, and the nature, context, and timing of the communication, when **Almadaoji** refers to "Tazkiah," I believe he means the Islamic term alluding to "tazkiyah al-nafs" meaning "purification of the self."

you don't need to worry." **Almadaoji** then advised that he met the UCE and got $2000.

**Almadaoji** later sent a picture of what appeared to be a US passport and a large amount of cash.

61.     On or about October 5, 2018, **Almadaoji** informed the UCE that he was asked if they wanted to arrive in Peshawar, or Astana. **Almadaoji** stated, "Peshawar is in Pakistan so we need a visa from the embassy here. So I told him Astana." **Almadaoji** further explained to the UCE that the smuggler would pick them up at the airport, and **Almadaoji** would have the code word to ensure they were traveling with the right smuggler.

62.     On or about October 6, 2018, the UCE told **Almadaoji** that he had an additional $1000 and asked if $8000 would be enough for their travel. **Almadaoji** replied, "Yea bro 8k will do it." **Almadaoji** told the UCE, "If all goes well, we'll departure 10 days from now in shaa Allah." **Almadaoji** stated if anything got in the way they could push the date back because October 16 was not "forced upon us."

63.     On or about October 8, 2018, **Almadaoji** told the UCE that "the brother is getting things ready" and "the tour guide is gonna take us straight to the brothers and the brothers will know we're coming." The UCE confirmed he obtained the rest of the money. **Almadaoji** replied, "Alhamdulillah I'll try to go to the bank and reopen my account." He informed the UCE, "Alhamdulillah it's all going well. Once I put money in the bank, we're booking in shaa Allah." **Almadaoji** stated that he had concerns about depositing cash into his bank account because the serial numbers on the currency could be traced, and indicated he could convert the cash into money orders to be deposited. On October 9, 2018, **Almadaoji** confirmed that he was "sticking with money order[s]."

64.     Earlier in October 2018, **Almadaoji** instructed the UCE to download a different messaging application for their travels; the UCE did so.  **Almadaoji** instructed the UCE to "reply yes to my [messaging application] message and add a few things to make it look normal."

65.     On or about October 10, 2018, **Almadaoji** informed the UCE that his "Bank account is good Alhamdulliah" and advised, "You gotta start looking for a car rental now bro."  The UCE replied he just needed to know the date.  **Almadaoji** responded, "OK it depends on what day my credit card comes [in]" and, "If it does Saturday we'll book for the 16th, if Monday we'll book for the 17th."  **Almadaoji** further explained he would make more trips to the bank to deposit the money.  The UCE advised that he was unable to obtain further funds from the credit-card scam. **Almadaoji** replied, "Alright bro they're maxed out.  Just forget about it.  We have enough Alhamdulliah."

66.     Between October 10, 2018, and October 22, 2018, **Almadaoji** continued to wait for delivery of his credit card from the bank.  On or about October 19, 2018, **Almadaoji** told the UCE that the credit card did not arrive and that he "Called and they [the bank] said it [the credit card] should be here Monday the latest."  During that time, **Almadaoji** continued to research airfare and flight schedules for travel from Columbus, Ohio, to Astana, Kazakhstan, and he shared the results of his research with the UCE.  During this time period, surveillance observed Almadaoji walk to the mailbox of the SUBJECT PREMISES to retrieve mail on multiple occasions.

67.     On or about Monday, October 22, 2018, **Almadaoji** was observed by surveillance walking to the mailbox of the SUBJECT PREMISES and retrieving mail.  On that same date, **Almadaoji** told the UCE that the credit card arrived in the mail.

## VII.    Almadaoji purchased tickets for travelling overseas

68.    On or about October 23, 2018, I obtained records showing that tickets have been issued in the name of "**Naser Almadaoji**" for travel as a passenger on flights from, and to, the following locations, and on the following dates: (1) from John Glenn Columbus International Airport to Washington Dulles International Airport on October 24, 2018; (2) from Washington Dulles International Airport to Frankfurt Airport on October 24, 2018; and (3) from Frankfurt Airport to Astana International Airport on October 25, 2018.  Records indicate that the tickets were purchased using a credit card for a total cost of $1415.33.

69.    On or about October 24, 2018, at approximately 10:00 a.m., **Almadaoji** met with the UCE at a local parking lot where the two had previously met.  The UCE drove **Almadaoji** to a local store, where **Almadaoji** purchased a bag and other items for his travel overseas.

70.    The UCE then drove **Almadaoji** to John Glenn Columbus International Airport in a rental car.  The UCE dropped **Almadaoji** off at the curb located near the departure terminal and returned the rental car, leaving **Almadaoji** by himself.  **Almadaoji** proceeded to the airline ticket counter, where he obtained his boarding pass.  After **Almadaoji** obtained his boarding pass and walked towards TSA security, law-enforcement officers arrested him.

71.    Based on the foregoing, there is probable cause to believe that on an exact date that is unknown, but at least by on or about October 24, 2018, in the Southern District of Ohio and elsewhere, **Almadaoji** attempted to provide material support or resources to a foreign terrorist organization—that is, ISIS Wilayat Khorasan and ISIS—in violation of Title 18, United States Code, Section 2339B.

72.    Based on my training and experience, I am aware that terrorism subjects will frequently keep evidence of their activities located within their residence. This evidence can

consist of jottings and notes on paper, jihadist literature and books, maps, and other material supporting violent jihad, including documents related to travel. I am also aware that individuals frequently keep information related to travel and financial activities in their personal possession or other close personal control, such as at their residence. This evidence can be maintained in paper and electronic form.

73.     As discussed above, **Almadaoji** has been observed travelling from and to the SUBJECT PREMISES prior to meeting with the UCE, and entering the SUBJECT PREMISES after obtaining cash from the UCE for travel in support of ISIS Wilayat Khorasan and ISIS. Almadaoji has also been observed retrieving and receiving mail at the SUBJECT PREMISES related to his travel. Specifically, on October 22, 2018, Almadaoji was observed retrieving the mail at the SUBJECT PREMISES and then informed the UCE that he had received his credit card in the mail. Tickets for travel from the United States to Kazakhstan were then issued under **Almadaoji's** name and purchased with a credit card. Consequently, there is probable cause to believe that evidence of **Almadaoji's** attempt to provide material support and resources to ISIS will be located at the SUBJECT PREMISES.

## **TECHNICAL TERMS**

74.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.     Computer:  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

      b.     Storage Medium: The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

      c.     IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      d.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

75.     As described above and in Attachment B, this application seeks permission to search for and seize records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76. *Probable cause.* I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  As discussed above, this investigation has uncovered evidence of the use of computers and electronic devices by **Almadaoji**. Specifically, **Almadaoji** has communicated with the UCE and CHS using an electronic messaging application known to be used on electronic devices. In September 2018, **Almadaoji** agreed to translate ISIS propaganda and provided CHS Persona #3 with a digital file entitled "In The Name of Allah.docx." Accordingly, there is probable cause to believe that one or more computers or mobile devices found at the search location will contain evidence relating to the illegal activity discussed in this affidavit.

b.  Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

c.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so

because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

        d.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

        e.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        f.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    77.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate

how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. Based on my experience, a computer can generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

78. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search for information that might be stored on storage media often requires the

seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.       Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

79.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

80.    Because several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure of those items as well.

## CONCLUSION

81.    Based on the above, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempt to provide material support and resources to a foreign terrorist organization) have been committed by **Naser Almadaoji** and that there is probable cause to believe that evidence, fruits, and instrumentalities of such violations are present at the SUBJECT PREMISES.   I, therefore, respectfully request that a search warrant be

issued authorizing the search of the SUBJECT PREMISES, as further described in Attachment

A, for the seizure of the items listed in Attachment B.

Respectfully submitted,

Michael J. Herwig
Special Agent, FBI

Subscribed and sworn to before me on October 24, 2018.

Hon. Michael J. Newman
United States Magistrate Judge

34

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The SUBJECT PREMISES is the premise known as 1555 North Fairfield Road, Beavercreek, Ohio 45432, further described as a two-story detached home with a two-car garage. The property exterior consists of brick and siding.  There is an enclosed breezeway between the garage and the main living area.  A photo of the SUBJECT PREMISES is included below:



B42000500030005900  06/27/2018

1

## ATTACHMENT B

### ITEMS TO BE SEIZED

1.  All records relating to violations of an 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign terrorist organization), those violations involving **Naser Almadaoji** and occurring in or about January 2018 through in or about October 2018, including but not limited to:

   a.  Records and information relating to ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations;

   b.  Records and information relating to support of ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations;

   c.  Records and information relating to travel, including travel plans, itineraries, reservations, bookings, tickets, and the means and sources of payment for travel;

   d.  Records and information relating to intentions, attempts, and plans to commit a terrorist attack, or to fight with ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations, including, without limitation, funding, materials needed for an attack, materials needed for training for such an attack, maps, disguises, aliases, weapons, or the other materials that may assist with such an attack, or attempted attack;

   e.  Records and information relating to communications with other individuals relating to ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations, concerning terrorist activity, or potential terrorist attacks, in the United States and other countries;

   f.  Records and information relating to **Almadaoji's** use of YouTube, Facebook, and other forms of social media and internet communication;

   g.  Records and information relating to videos or other content created, publicly posted, or viewed by **Almadaoji** on the internet relating to ISIS, ISIS Wilayat Khorasan, any other foreign terrorist organization, or jihad;

   h.  Records and information relating to ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations, including any notes on paper, jihadist literature and books, maps, and other material supporting violent jihad; and

   i.  Head scarfs and other attire used in **Almadaoji's** video relating to ISIS, ISIS Wilayat Khorasan, and other foreign terrorist organizations.

2.     Computers or storage media used as a means to commit the violations described above.

3.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant:

a.  evidence of who used, owned, or controlled the computer or storage medium at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the Computer or storage medium, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the Computer or storage medium of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or storage medium;

h.  evidence of the times the computer or storage medium was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the computer or storage medium;

j.  documentation and manuals that may be necessary to access the computer or storage medium or to conduct a forensic examination;

    k.  records of or information about Internet Protocol addresses used by the computer or storage medium;

    l.  records of or information about the computer or storage medium's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    m.  contextual information necessary to understand the evidence described in this attachment; and

    n.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.